The TEXAS COMPANY

v.

R. O'BRIEN & CO., Inc.

No. 4910.

United States Court of Appeals First Circuit.

Aug. 26, 1955.

Joseph M. Brush, New York City, with whom Thomas H. Walsh, Boston, Mass., and Thacher, Proffitt, Prizer, Crawley & Wood, New York City, were on brief, for appellant.

Seymour P. Edgerton, Boston, Mass., with whom Charles S. Bolster and Bingham, Dana & Gould, Boston, Mass., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from an interlocutory decree in admiralty adjudging the tanker Ventura solely at fault for colliding with the trawler Lynn and referring the cause to an assessor for the determination of damages. The appellate jurisdiction of this court under Title 28 U.S.C. § 1292(3) is clear.

The vessels collided not long after dark on a clear calm evening in November in Broad Sound not far from the outer end of the North Channel leading into Boston Harbor. There is and can be no substantial dispute as to the following facts.

The Lynn, a steel-hulled diesel-powered trawler about 100 feet long and of approximately 170 gross tons owned by the appellee R. O'Brien & Co., Inc., left her berth at the Fish Pier in Boston Harbor about 4:30 p. m. on November 28, 1951, bound for Georges Bank on a fishing trip. She was preceded out of the harbor by about half a mile by the trawler Bonnie and followed by about the same distance by the trawler Ballard. The speed of the three vessels as they traversed North Channel and approached Broad Sound was between 8 and 9 knots.

The Ventura, a T–2 tanker over 500 feet long and of approximately 10,500 gross tons, owned by the Ventura Corporation and operated under a bare boat charter by the appellant, The Texas Company, left the Union Oil Dock in Chelsea about 3:30 p. m. on the same day bound for Eagle Point on the Deleware River in New Jersey. She dropped her undocking pilot and discharged her tugs at about 4:30 at a point some distance further up the harbor than the Boston Fish Pier. She then proceeded in charge of a qualified coastwise pilot out of Boston Harbor at various courses and speeds and without incident until she overtook the Ballard in the North Channel. At that time she was proceeding at her full speed of 13 or 14 knots.

The pilot of the Ventura sounded one whistle blast to the Ballard, which was not answered although it was heard by the captain of the latter vessel who was on deck but not by the men in the pilothouse, and then, in accordance with the signal, the Ventura passed the Ballard close aboard on its starboard side. At about that time the pilot of the Ventura saw the lights of the Lynn ahead as that vessel turned to starboard around buoy No. 1 at the southerly side of the mouth of the North Channel and shaped its course through Broad Sound toward the whistling buoy north of The Graves. The Ventura, after passing the Ballard swung slightly to port and then swung gradually to starboard around buoy No. 1 and also shaped its course toward the whistling buoy off The Graves.

The pilot of the Ventura sounded two blasts of the whistle when his vessel was somewhere between 250 and 400 yards behind the Lynn but received no

answer. Nevertheless he undertook to pass the Lynn on its port side and in doing so the vessels collided, the stem of the Ventura striking the port side of the Lynn about 24 feet forward of its stern post. The Lynn swung around the stem of the Ventura rolling over on its starboard beam ends as it did so, passed down the port side of the Ventura, still on its beam ends, and filled and sank with the loss of 15 of the 17 men on board.

The vessels involved were lighted in every respect as the law requires and except for the Bonnie and the Ballard, which picked up the surviving captain and helmsman of the Lynn, there were no other vessels in the immediate vicinity.

There is the usual sharp conflict in the evidence as to the cause of the collision. The pilot of the Ventura, corroborated by its captain, testified that after the two-blast passing signal was given and the Ventura was about to pass in accordance therewith, the Lynn swung radically to port, and that when this maneuver was observed, the Ventura's rudder was immediately put hard left and its engines stopped and reversed at full speed but that it was then too late to avoid the collision.

The captain of the Lynn, corroborated in substantial part by his helmsman, said that as the Lynn left North Channel he swung to starboard with buoy No. 1 close aboard on the starboard side and steadied up on a course putting The Graves whistling buoy about two points (22½ degrees) on his starboard bow and that he held that course and maintained his speed until seconds before the collision. He said that when he was in North Channel he saw the lights of a large steamer over a mile astern and knew that it was following him, but that he did not look astern again to observe its speed or to find out if it was overtaking him. He said that he heard no passing signal and was not aware that any vessels other than the Bonnie ahead and the Ballard astern were in his immediate vicinity until he heard the ringing of a bell. When he heard the bell he said he signaled slow speed on his engine and looked out the starboard door of his pilothouse. Seeing nothing he crossed the pilothouse and looked out the port door and saw the stem of the Ventura towering over him about six to eight feet away on his port quarter. He immediately ordered his engine at full speed and the rudder put hard right and jumped to the helmsman's side to help put the wheel over but it was then too late to escape.

The District Court in general believed the Lynn's version of the collision. It found that the Ventura sounded a two-blast passing signal to the Lynn as stated above but that the signal was not heard on board the Lynn, and that the pilot of the Ventura took no steps to reduce speed or alter course when his whistle signal was not answered but maintained his course and speed until just before the collision occurred. It also found that as the Ventura made its gradual swing to starboard around buoy No. 1, it swung to a course of 73 degrees and then steadied up on a course of 72 degrees which brought The Graves whistling buoy only 2 degrees on its starboard bow, thus putting the Ventura on a narrowly converging course with the Lynn.

We do not pause to consider whether the Ventura is to be charged with fault for persisting in its attempt to pass without waiting for a two-blast whistle of assent from the Lynn. The finding that the Ventura's course was 72 degrees and that no attempt to alter it was made until just before impact is supported by that vessel's mechanical course recorder. And it is evident from the chart that on that course she was converging with the Lynn if that vessel was on a course putting The Graves whistling buoy 2 points or 22½ degrees on her starboard bow as her captain and helmsman testified. Thus, regardless of any other fault, the Ventura as the overtaking vessel was attempting to pass the Lynn in violation of the first sentence of Article 24 of the Inland Rules, 33 U.S.C.A. § 209, which provides:

"Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel."

The question of the Lynn's contributing fault remains to be considered.

The proctors for the Ventura claim that the Lynn was at fault in two vital respects, failure to maintain a proper lookout and failure of its captain to keep the movements of the Ventura under observation after he saw that vessel a mile or so astern. They say that had the Lynn had a proper lookout the passing signal of the Ventura would have been heard, or had the captain of the Lynn, who knew a large steamer was behind him, kept that vessel under observation, he would have known that the Ventura was coming up behind and going to pass on his port side, and that if it were passing too close aboard he could have either sounded the danger signal or at the last moment swung to starboard and avoided the collision.

The failure of the Lynn to sound the danger signal of several short blasts on its whistle before the collision was not causal for such a signal would have told those on the Ventura nothing they did not know already. See Seaboard Tug & Barge, Inc., v. Rederi AB/Disa, 1 Cir., 1954, 213 F.2d 772, 774. They had the Lynn under constant observation for several minutes before the collision and the lookout on their vessel had signaled with his bell when the Lynn was on their starboard bow, again when it was ahead, and in addition rang several alarm signals on his bell as the vessels approached dangerously close, which was the bell heard by the captain of the Lynn. An alarm signal by the Lynn could have added nothing to what the pilot of the Ventura already knew. Furthermore, had the Ventura's passing signal been heard on the Lynn the latter's obligation would have been to hold course and speed and that we are convinced, the testimony of

the pilot of the Ventura to the contrary notwithstanding, is just what she did. Thus, if a lookout on the Lynn had heard the Ventura's signal and reported it, the navigation of the Lynn should not have been other than it was.

Nor was the captain of the Lynn under any duty to keep the Ventura under observation. He was not in narrow waters at a busy time cf. Stevens v. United States Lines Co., 1 Cir., 1951, 187 F.2d 670. He was in an open sound, his lights were burning brightly and no other vessels were in the vicinity to screen his vessel from view or distract the attention of the pilots of overtaking vessels, or to interfere with the navigation of any such vessel. Under these circumstances he was fully justified in assuming that any overtaking vessel, large or small, would obey the mandate of Article 24 of the Inland Rules and keep out of his way.

The proctors for the Ventura also contend that just before the collision the Lynn must have swung radically to its left across the Ventura's bow for in no other way can the position of the Lynn after it sank or its condition and the position of its rudder as discovered after it was raised be explained. Perhaps some support for this contention can be found in the testimony of one of the expert witnesses called on behalf of the Ventura but we do not find it convincing in the face of the definite testimony of the captain and the helmsman of the Lynn, to say nothing of the substantially corroborated testimony of the lookout on the Ventura. It will be enough to say that a careful examination of the voluminous record and the numerous exhibits convinces us that the District Court properly charged the Ventura with sole fault for the collision. Certainly we cannot say that it was clearly wrong in doing so.

The decree of the District Court is affirmed.