**NATIONAL DISTILLERS PRODUCTS CORPORATION**

v.

**BOSTON TOW BOAT COMPANY and THE TRITON and HERCULES.**

No. 52-31-A.

United States District Court, D. Massachusetts.

Feb. 21, 1955.

On Rehearing Sept. 14, 1955.

Thomas H. Walsh, Leo F. Glynn, Boston, Mass., Paul F. McGuire, New York City, of counsel, for plaintiff.

Seymour P. Edgerton, Bingham, Dana & Gould, Boston, Mass., for defendant.

ALDRICH, District Judge.

This is a suit in admiralty to recover damages caused by the grounding of the S. S. Carrabulle while she was being taken stern first out of Chelsea Creek into Boston Harbor on September

24, 1951. The action is in rem against the tugs Hercules and Triton, and in personam against Boston Tow Boat Company, hereinafter called the respondent, the owner of these two tugs, and two other participating tugs, Luna and Venus. Libellant was not the owner of the Carrabulle on September 24, 1951, but I shall refer to it as if it were.[1]

The Carrabulle is a Liberty-type tanker 423' over-all and 57' beam. On the morning of September 24th she completed her unloading at the State Fuel Dock on the south side of Chelsea Creek, and notified the respondent to send four tugs to take her into the stream. Thus unloaded she drew 13' 10" aft and 6' 6" forward. Under normal load she drew 27' or more, both fore and aft, so that on the day in question her bow was high out of water, both actually and relatively. One witness testified that the bow was some 40' high, and I so find. Being a tanker there was comparatively little superstructure except the bridge and adjacent quarters, which were almost exactly amidships.

The tugs arrived at about 2:10 p. m. E.D.S.T. Prior to that time the Carrabulle's engine had been warmed up and everything made ready. Captain Sullivan, an employee of the respondent, came aboard from the Luna to serve as undocking pilot. He did this, as libellant well knew, under a standard agreement, known as the pilotage clause, that while so acting he was to be considered the servant of the libellant and not of the respondent.[2] The tugs thereupon took positions assigned to them by Captain Sullivan on the way up. The Hercules passed a stern line to the Carrabulle's stern, which was led through her after chock, located about midway on the port counter. The Luna placed her bow against the Carrabulle's port quarter, running a bow line to the ship. The Triton made up heads and points, with three lines, on the Carrabulle's port bow, and the Venus placed her bow against the Triton. By this maneuver the Venus and the Luna held the starboard side of the Carrabulle against the dock while her lines were being cast off. The dock was set in from the channel, and after she was free the Hercules by hauling on the stern line and the Luna by backing up pulled the vessel's stern out, aided by the Triton proceeding ahead with hard left rudder to start the bow. Although it is agreed that the stern of the Carrabulle thereupon proceeded in a general westerly direction down the creek until it struck the mud and some submerged pilings on the south side of the channel, the manner in which this happened, and the intermediate events are not agreed. I am not helped in the resolution of the dispute by the circumstance

---

1. The respondent calls attention to the fact that the libellant did not become the owner of the vessel until the month following the accident, and that the assignment to it from the prior owner did not mention this claim in specific terms. However, as I read the assignment I would hold that this cause of action was included if the former owner had not previously parted therewith. Cf. Marthens v. Pennsylvania Ry. Co., 7 Cir., 78 F.2d 37. There is a presumption of continuance of ownership in the absence of evidence of alienation. McGee v. Scott, 9 Cush., Mass., 148, followed in Long v. George, 290 Mass. 316, 195 N.E. 377.

2. The pilotage clause, so called, read as follows: "When the captain or other officer of any tug provided for, or engaged in, the service of furnishing tug power or assistance to a vessel which makes use of or has available her own propelling power goes on board said vessel, or any other licensed pilot goes on board said vessel, it is understood and agreed that said tug boat captain or other officer or licensed pilot becomes the servant of the owners of said vessel in respect to the giving of orders to any of the tugs provided for, or engaged in, said service and in respect to the handling of such vessel, and neither those providing the tug or tugs nor the tug or tugs, their owners, agents or charterers shall be under any liability for damages resulting therefrom, and, further, that said tug, or tugs and/or their owners, agents and/or charterers shall be under no liability for executing the orders of said tug captain or other officer or licensed pilot."

that Captain Sullivan is no longer available.

One of the difficulties relates to times. This difficulty is not solved by any one method, although I have before me the deck log, the engine-room log, and the bell book of the Carrabulle. There were no logs of the tugs. Entries on these books show that the stand-by signal was given by the bridge to the engine-room at 2:19. Whether that time is correct or not makes no material difference. The next time that occurs in any book is 2:36, when the deck log shows all clear of the dock and the engine ordered full ahead for ½ minute. (The bell book shows the ahead signal as 2:36½, stop at 2:37.) Following this the engine was ordered ahead again at 2:38. It is conceded that on this second occasion she did not respond—a matter I shall deal with later. She was ordered to stop at 2:38½. The libellant testified that at 2:38 the ship was aground—a matter somewhat confirmed by entries in the books. Captain Haugland, master of the Carrabulle, testified in accordance with the deck log that all clear of the dock—meaning that lines were aboard and they were 50′–100′ away—was at 2:36.

One thing that is abundantly clear is that the Carrabulle did not proceed from the dock to the strand in two minutes. It is about 1000′ from the dock to the point where she grounded, and she would have had to proceed at an average speed, starting from almost nothing, of about 5 knots to have traversed this distance between 2:36 and 2:38. Added to this is the conceded fact that there was an adverse tide of about ½ knot. Furthermore, the engine was running full ahead for at least ½ minute during this period. I am forced to conclude that the ship either did not ground until considerably after 2:38, or that she was clear of the dock well before 2:36.

In spite of the fact that I believe certain supporting entries may have been made on the libellant's books somewhat after the event, I find that the grounding occurred at 2:38. I reach this in the following manner.

It is, of course, not possible to determine how many minutes it took the tugs to haul the ship away from the dock. If that was not accomplished until 2:36, at which time, concededly, the engine was run full ahead for at least ½ minute, it is not clear why the Carrabulle's first movement would have been to have started forward up the creek when her proposed course was stern first in the opposite direction. Conceivably this might have been to straighten her out, but there was no testimony of any such purpose, and at this point she had at least three, if not four, of the tugs working on her. She was still close to the dock, and I will be slow to assume in the absence of any direct testimony that the engine was used under these circumstances for the purpose just suggested. On the contrary, I believe the more logical occasion to run the engine ahead for the first time was when the sheer developed that I am about to refer to.

Secondly, if 2:36 was the moment the vessel was clear of the dock, a time at which she had very little way on her, running full ahead for even one half minute, if it did not start her ahead, would at least seem enough to cut such stern way as she did have, and leave her about dead in the water. There is considerable testimony, and I find, that she proceeded 400 or 500 feet from the dock before the sheer developed. Respondent contends that the 2:38 full ahead signal, to which the engine did not respond, was the one when the sheer commenced. This would mean that the vessel traveled 400–500 feet from a stopped position, by means of two tugs, and against a current of perhaps ½ knot, between 2:37 and 2:38 (or between 2:36 and 2:38, with ½ minute full ahead on the engine). I do not believe that.

Furthermore, if 2:38 was the commencement of the sheer, what was happening on board thereafter? It must have taken an appreciable period from the commencement of the sheer until

she grounded. Respondent claims that at 2:38½ the engine or wheel was ready to turn again. Even if the engine room failed to notify the bridge of the "repair," is it not logical to assume that thereafter there would have been frantic calls from the bridge—what are you doing? Instead, the bridge, having signalled, unsuccessfully, for full ahead at 2:38, signalled to stop at 2:38½. If they were aground, that was a good reason for such a signal. Otherwise there was no reason for cancelling the order. On the other hand, if 2:36 was at or after the commencement of the sheer, there was a reason for a stop signal at 2:37, viz., that Sullivan thought at that moment that he had given her enough, and that the rest of the straightening could be handled by the tugs.

This leaves two slight questions. If they were aground at 2:38, how was the engine room able to free the wheel at 2:38½? I believe, although the wheel was in the mud, that this alone did not stop her, but one of the broken piles there did, which subsequently became free. This, also, would account for the mud on the blades of the wheel above water, which cannot be accounted for if the 2:38 episode was in midstream. The presence of this mud was brought out by libellant in depositions before trial, and the respondent had ample opportunity to contradict it, and did not.

The other question relates to he rudder. Apparently at one point the Carrabulle's rudder was put at hard right, but was nearly straight at or after the strand. This fact, in my opinion, is about as consistent with one time of grounding as the other.

Before going into questions of liability it would be well to discuss how the sheer originated. Libellant claims it was caused by inattention on the part of the Hercules; that while the Hercules had a stern line to the Carrabulle,

this line, not merely occasionally, but at all times, even when she was being towed stern first from the dock, hung loose, and that the Hercules did nothing but keep out of the way. I do not believe this. I think the sheer originated in quite another fashion.

The wind between the hours of 2:00 and 3:00 that afternoon was blowing from the southeast at a rate of 18 miles per hour at the East Boston Airport. This point of observation is not much more than a mile from Chelsea Creek, but I assume that the creek was in a relatively sheltered position. The Carrabulle's log gives the wind as Force 2, which is agreed meant 4–7 m. p. h.[3] Respondent testified the wind was 10–12 m. p. h. and I so find.

When the vessel had reached a point approximately half way between the dock and the point of stranding a gust of wind hit the bow, and it fell off rapidly towards the Chelsea shore on the north side of the channel, causing the stern to sheer in towards the southerly bank. Libellant questions the existence of any such gust, and denies that it would have had such an effect had it occurred. In view of the shape of the hull above water at this time, and the considerable disparity between her draft fore and aft, it is my opinion that this is exactly what happened.

About half way from the dock to the old Meridian Street bridge it was necessary to take a slight southerly turn. This was effected by the Hercules. The Triton did not propose to, and perhaps could not, remain heads and points through the bridge,[4] and at this moment cast off, or was cast off, by direction of Captain Sullivan. The southeast wind on the bow, which tended to drive the bow towards the Chelsea shore, had been offset by the Triton, with her 13' draft, when she was working, but when she cast off, the bow started to swing. Very likely

---

3. Apparently there has been a change in the Beaufort Scale since the date of the court's formal instruction, when Force 2 meant 12–15 m. p. h. See Bowditch, 1925 edition.

4. Actually, the bridge was gone, but the same narrowing in the channel remained, only less distinct, and hence more troublesome, because there were then no marks.

this was accelerated by a gust of wind at the same time. The net result was far more of a swing than the Hercules intended, properly characterized as a sheer.

Libellant, for some reason, argues that the bow's sliding off meant that the bow traveled north, but would not mean that the stern would travel south. I believe this is a misconception. If the vessel were dead in the water, of course libellant would be correct. However, by this time she had considerable way on her. The whole principle of steering a boat is that she pivots forward. Left rudder, when she is moving ahead, does not turn the bow to port so much as it drives the stern to starboard, shifting the axis of the vessel, so that her way carries her to port. When the Carrabulle's bow, proceeding backward, fell off, her stern was bound to proceed the other way unless she could be checked, or her axis straightened out again. Libellant is perhaps right in that this may not have been so marked a maneuver as it would have been had the turning been accomplished by a rudder, with all propulsion furnished by the wheel, but I believe the principle is the same.

Even an 18 m. p. h. gust of wind in Chelsea Creek is not vis major, and certainly could have been expected by Captain Sullivan, especially since he had just come from the harbor proper, where better observation could have been made. Also, the condition of the hull, above and below water, was readily apparent to all. Not only was the Carrabulle's bow high out of water, but it was drawing only 6'6", while her stern drew 13'10". Furthermore, of course, there was no rudder at the bow, and I believe the bow would have a natural and foreseeable tendency, if not checked, to fall off before a quartering wind, particularly when the vessel was proceeding sternward slowly, as all agree she was.

I believe that the bow fell off too far when Captain Sullivan cast off the Triton, and that this is something which could have been, and should have been anticipated. I find that he was negligent.

The question arises whether this is negligence which should be attributed to the respondent, or to the libellant. Respondent argues that Captain Sullivan was, on the bridge, under the pilotage clause, the servant of libellant, and that his negligence must accordingly be so charged. Libellant contends that the plan of how to take the vessel into the stream was conceived and communicated to the tugs by Captain Sullivan before he came on board and was, accordingly, not insulated by the pilotage clause. Publicker Industries, Inc. v. Tugboat Neptune Company (The William J. Worth), 3 Cir., 171 F.2d 48, 1949 A.M.C. 121. Respondent answers that whatever Captain Sullivan may have done on the way up was merely in anticipation of what he was going to do on board and that the principle of the Worth case does not apply, and that, anyway, he did nothing negligent before taking the bridge.

The resolution of this requires some additional facts. I find that on the way up Captain Sullivan, by radio phone, instructed the Triton, inter alia, that when they approached the bridge on the way back she should get off the Carrabulle's port bow. He similarly instructed the Venus that after they were well off the dock (an earlier period, in point of time) she should cease assisting the Triton, and should go around and make fast to the Carrabulle's starboard bow. There was no testimony as to the reason for this exchange. It may have been to facilitate operations after they arrived in the harbor proper. It may have been because the better water going through the bridge was on the south side of the channel and the tugs drew considerably more than the Carrabulle's bow. In any event, I see no reason for disbelieving this testimony.

The important question, in view of the preceding arguments, and one on which there is no evidence at all, is whether as a part of these original instructions Captain Sullivan told the Triton she

should let go before the Venus was fast, and/or whether he told the Venus she was not to make fast until the Triton let go. In view of the fact, among other things, that because of the height of the bow neither tug could see to check on the other, I do not believe that he gave any advance instructions on this minor point. I find that the tugs were to proceed independently of each other, each to be subject to his orders from the bridge as to the exact timing of their maneuvers.

 The sheer commenced as the Triton was taking in her last line, just too late to stop its being dropped. At the same moment the Venus was in the process of making up to the other bow. This casting off of the Triton was by orders given by Captain Sullivan from the bridge. The moment was chosen by him at that time, when he either knew that the Venus was not yet secure, or at least did not know whether she was or not. This was his negligence. It occurred entirely while he was libellant's servant under the pilotage clause, and the negligence must be charged to it.[5] Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311.

 I do not find that the sheer was caused or contributed to by the Hercules, or by any acts or omissions of any of the other tugs. Nor do I find that the overall plan to exchange the Venus for the Triton was of itself negligence. I believe a tug on either bow could have held her.

Once the sheer had commenced was there any further fault? I find none on the part of the Hercules. Pulling straight ahead would do little to break the sheer, but I find that as soon as she could she got around to hauling the stern off. With the greater draft aft and the wind continuing to drive the bow, in this short interval she was insufficiently successful. I find no fault on the part of the Triton, apart from the fault which I do not charge to her as a vessel of casting off in the first place. Having in mind that she had less than two minutes to act, and that the Carrabulle was under way, I do not believe she had time to maneuver enough when the bow came down on her to do any good. Nor do I charge the Venus simply because she missed the first line. The Luna was out of the picture.

 It is apparent that Captain Sullivan thought the Hercules was going to right the ship herself, assisted by the half minute full ahead at 2:36½. This was an error. He should not have given the stop signal at 2:37. No harm would have come of continuing the ahead except that it would have slowed up the proceedings. Doubtless he may have thought that "the tug had her." But he was on a new ship, to him, the sheer must have been still continuing, and his failure to keep turning the wheel ahead must have been dictated more by a desire to hurry along than by prudence. Continuing to run her ahead, also, would have given the tugs more time to get onto the bow. I find that he was again negligent. This negligence, too, is chargeable to libellant. The libel must be dismissed.

### On Rehearing

The present question, on motion for reconsideration, is the effect of Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, and possibly United States v. Nielson, 349 U.S. 129, 75 S.Ct. 654, on the decision previously handed down.

5. I rule, in accordance with libellant's contention, that this clause must be construed strictly against respondent. The William J. Worth, supra. I do not rule that the clause is invalid because respondent was the sole towing service available, so that libellant was forced into accepting this agreement. The short answer to this is that libellant was not forced to take Captain Sullivan aboard. The bridge could have been handled by its own master. His negligence would have been chargeable to it. It was no worse off if it chose to employ Captain Sullivan. Respondent, by offering Captain Sullivan's services for hire, did not have to guarantee their results.

Libellant suggests that Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311, has now been restricted. Whether or not that is so, I agree that where Bisso leaves off and Sun Oil begins may present a problem.

In Bisso the court has held that a contract exempting a towage company from its negligence while towing a barge, unmanned, and without power, is against public policy. It distinguished Sun Oil, which had held that a contract exempting the towage company from the negligence of its master while acting as pilot for an assisted vessel, using its own crew and power,[1] was valid.

The respondent naturally points out that Bisso involved a towed and not an assisted vessel. The only case I have found suggesting a possible legal distinction between towage and assistance is Sun Oil itself, where the court observed that "the services covered by the contract were less than towage." 287 U.S. at page 294, 53 S.Ct. at page 136. However, the court in Bisso did not emphasize this obvious and easy difference, but rather dwelt upon the nature of the services performed by the tugboat master as pilot.[2] If this distinction is carried to its logical limits, may not the tugboat master, even while aboard the assisted vessel as pilot, also act from time to time in his primary capacity as tugboat master, in which event the rule of Bisso would apply? In the present case I have found that the original negligence was Captain Sullivan's in casting off the Tri-

ton before the Venus was fast. This was not a case of directing the course of the Carrabulle to an improper spot, or even an improper maneuver of her own navigation, but merely mechanical manipulation of the tugs. Was this pilotage, and if not, does Bisso apply?

Faced with these questions, I received evidence on what is encompassed by pilotage. I find, as a result, that it is the uniform custom, in Boston and other ports where towing companies offer their tug masters as undocking pilots, for such services to be accepted. It is then the practice for the leading captain to take the bridge of the assisted vessel and thereafter to give all orders, both to the vessel and to the tugs. Although the master of the vessel remains in charge, he gives no orders, unless he chooses to relieve the tug captain altogether of his duties.

No evidence was offered as to who gives what orders to the tugs if a tug master does not take the bridge. Although the two shipmasters who testified had wide experience, one denied knowledge of any practice in such event, and the other was not even asked. The respondent sought to answer this question by indirection. The witnesses testified that the tug master who takes the bridge gives all orders to everyone because for two persons to be giving orders would be confusing. I follow the logic of this, but it does not particularly aid me in determining whether or not he was acting in one capacity or two.[3] I attach no signifi-

1. The record in Sun Oil discloses that the tugs were made fast to the ship for use in case a sheer developed, but that none did. The ship was drifting with the current in a spot where the tug master intended her to be when she grounded by reason of his faulty knowledge of the depth.

2. A distinction between towage and assistance does not seem to me a very happy one. Is a vessel fully manned, but without power, assisted, or towed? Is there to be a difference between a vessel largely using her own power, with occasional assistance from the tugs, and one, like the Carrabulle, largely dependent upon the tugs, with occasional assistance from her own power? I do not feel I would be

justified in attaching weight to the fact that the respondent charges more per tug for towing than for assisting. It is a matter of speculation why it does that, and it may be simply a case of what the traffic will bear. Nor does its price differential depend on whether the towed vessel is manned or not, or whether the assisted vessel does or does not use the tug master as pilot.

3. The Maren Lee, 2 Cir., 278 F. 918, infra; Brow v. Boston & Albany R. Co., 157 Mass. 399, 32 N.E. 362; Moore v. Southern R. Co., 165 N.C. 439, 81 S.E. 603, 51 L.R.A.,N.S., 866; Laugher v. Pointer (K.B.), 5 B. & C. 547.

cance to 46 U.S.C.A. § 364, which requires every vessel, with exceptions not here material, to have on board a pilot licensed for the harbor in which it is proceeding. That Captain Sullivan satisfied this requirement does not mean that everything he did was pursuant thereto.

There does not seem to be any direct authority as to the limit of the true functions of a pilot. Respondent cites a statement in Bisso that the Sun Oil clause "related only to pilotage", 349 U.S. at page 92, 75 S.Ct. at page 633, and points to the fact that the Sun Oil clause, like respondent's, included the giving of orders to tugs. This observation was only dictum, and possibly not deeply considered in its implications, because in Sun Oil the actual fault of the tug master was clearly pilotage.[4]

In various cases where there were no exculpatory clauses involved there are suggestions that there is a distinction between giving orders to the tugs, and to the vessel. In Logue Stevedoring Corp. v. The Dalzellance, 2 Cir., 198 F.2d 369, the court, in holding harmless the towing company, particularly adverted to the fact that the tug master-pilot's misconduct related only to the vessel, and that he gave no orders to the tugs. In The Maren Lee, 2 Cir., 278 F. 918, a towing company was engaged in towing a schooner which had her own crew aboard, but took the master of the tug as contractual pilot. On approaching another vessel he gave the wrong order to the tug and a collision ensued. The court, speaking through Judge Hough, held that the schooner was liable because the procedure was directed by its pilot, but that the tug was liable because the person giving the order was its master.

█ I find that in giving orders to tugs the tug master goes beyond the traditional functions, capacity and skills of a pilot, particularly those stressed in Bisso, 349 U.S. at pages 93–94, 75 S.Ct. 629, in distinguishing Sun Oil. While the term "undocking pilot" is recognized for one in Captain Sullivan's position, Texas Co. v. R. O'Brien & Co., 1 Cir., 225 F.2d 280, the very fact that he was employed in addition to the regular harbor pilot, who went below to await the departure of the tugs,[5] indicates that an undocking pilot is something more than a pilot. I believe that in upholding the exculpatory clause in this case I would be exceeding the expressed pilotage qualification in Bisso and go beyond Sun Oil.

█ It does not follow that this should not be done. The burden of establishing that a contractual provision is against public policy is on him who asserts it. While there are differences, of course, between ordering a maneuver of the ship, which is part of the normal function of the pilot, Essex County Electric Co. v. M. S. Godafoss, D.C.Mass., 129 F.Supp. 657, and ordering a maneuver of the tugs, both are for the same ultimate purpose, to advance the ship in a particular direction. Where both orders are customarily given by the same person, to hold that the exculpatory clause applies to one and not to the other would seem to those directly concerned an incomprehensible legal technicality. Moreover, in many instances the ship's eventual plight might be due to a series of acts of both categories, raising difficult if not insoluble problems of liability.

█ Unlike towage employees in the case of a dead ship, in whatever he does the undocking pilot is under the direct observation of and subject to the ultimate control of the ship's master. I think it more practical to extend Sun Oil to include all of his actions under the contract than to follow every implication of Bisso. The order dismissing the libel will stand.

4. See note 1, supra.

5. A vessel is being "undocked" until the tugs leave her.