**CITY OF BOSTON, Plaintiff,**

v.

**SS TEXACO TEXAS, Her Engines Boilers, etc., Texaco Panama, Inc. and Boston Tow Boat Company.**

**Civ. A. No. 82–0101–N.**

United States District Court,
D. Massachusetts.

Nov. 13, 1984.

John R. Devereaux, Boston, Mass., for plaintiff.

William K. Dodds, Hale & Dorr, Boston, Mass., for Texaco Texas.

James F. McHugh, Bingham, Dana & Gould, Boston, Mass., for Boston Tow Boat Co.

David S. Mortensen, Hale & Dorr, Boston, Mass., for Texaco Panama, Inc.

James B. Re, James F. McHugh, Bingham, Dana & Gould, Boston, Mass., for Boston Tow Boat Co.

## MEMORANDUM AND ORDER

DAVID S. NELSON, District Judge.

This case arises out of a claim for damages resulting from the collision of the boat, SS TEXACO TEXAS, with a pier and bridge owned and maintained by the plaintiff, City of Boston, on January 15, 1979. The defendants are Texaco Panama, Inc., owner and operator of the SS TEXACO TEXAS, and Boston Tow Boat Company, owner and operator of the tugs WALTON and CABOT.

The City of Boston filed the suit, pursuant to 28 U.S.C. § 1333, on January 14, 1982. Texaco and Boston Tow answered to the City's Complaint and filed cross claims against each other for indemnity and contribution.

These issues came on for trial, and after careful consideration the court finds that judgment in full must enter against Texaco in the amount of $225,000 plus interest. The court's findings of fact and conclusions of law are set out below.

## FINDINGS OF FACT

1. The SS TEXACO TEXAS is an oil tanker with an overall length of approximately 625 feet, a beam of 85 feet, and a displacement of 28,000 gross tons when fully loaded. As earlier stated, the defendant's ship, carrying 81,000 pounds of petroleum products collided with the City of Boston's McArdle Bridge on January 15, 1979.

2. Three days prior to this incident, Robert Hegerich, the Boston manager for Texaco, Inc. made arrangements with the Boston Tow Company to obtain assistance in navigating the TEXACO TEXAS from Boston Harbor to the Texaco dock on the Chelsea River. Mr. Hegerich had requested towboat assistance of Boston Tow for Texaco's vessels on many occasions in the past. In addition, he had previously seen Boston Tow's "Schedule of Tug Power Rates and Terms for Steamships and Motor Vessels." The Rate Schedule in effect in January 1979 included the following clause:

> PILOTAGE—When the captain or other officer of any tug provided for, or engaged in, the service of furnishing tug power for, or assistance to, a vessel which makes use of or has available her own propelling power goes on board the said vessel ... it is understood and agreed that said tugboat captain or other officer or licensed pilot becomes the servant of the owners of said vessel in respect to the giving of orders to any of the tugs provided for, or engaged in, said service and in respect to the handling of such vessel, and neither those providing the tug or tugs, nor the tug or tugs, their owners, agents, or charterers shall be under any liability for damages resulting therefrom, and, further, that said tug or tugs and/or their owners, agents and/or charterers shall be under no liability for executing the orders of said tug captain or other officer or licensed pilot.

Pilotage clauses similar to this had appeared in Boston Tow's Rate Schedule for many years.

3. At the time of this event, two other companies Ross Tow Boat Company, and Fournier Tow Boat Company were providing two boat services similar to the defendant in Boston Harbor at the time of the collision. Also, Ross Tow Boat Company and other individuals not connected with Boston Tow, including at least one Texaco employee, were able to provide competent docking master services as of January 15, 1979. Whatever status Boston Tow enjoyed in Boston Harbor in January, 1979, was not, as I find, the result of exclusionary acts or practices. Testimony indicated that it was the practice in Boston Harbor for each of the tow boat companies to provide tug assistance to the other companies upon request, and, indeed, on occasion, a Texaco-owned tug present in the harbor would be found assisting Boston Tow. It was also Boston Tow's policy to provide tug boat assistance to any vessel without requiring that the assisted vessel have a Boston Tow captain on board as docking master. Essentially, then, I find that in January, 1979 Texaco had a range of options available to it with respect to tow boat services and docking masters but chose to hire Boston Tow.

4. In accordance with Texaco's request, the Boston Tow tugs CABOT and WALTON arrived alongside the TEXACO TEXAS in Boston Harbor at 0435 hours on January 15, 1979. CABOT's Master, Captain Paul Perkins, left CABOT in the command of his mate, Arvard McGray, and boarded the TEXACO TEXAS. Captain Luigi Barchi and his crew spoke Italian as their primary language. Captain Perkins gave Captain Barchi two documents. The first document, an "Approval Slip," included the aforementioned pilotage clause on its face. Immediately below the pilotage clause was the phrase, "I agree on behalf of my owners to the terms of the pilotage clause as here set forth." Captain Barchi signed in the space below this phrase and also signed beneath the word "Approved" on the face of the slip.

The second document was Captain Perkins' bill which indicated a charge of $90 "for service rendered in assisting master." Texaco subsequently paid Captain Perkins

directly in accordance with his bill. Boston Tow did not participate in securing or enjoying the remuneration paid by TEXACO to Captain Perkins for his services.

5. On the morning of the collision the wind was from the west northwest at 20 knots, gusting to 34 knots. Estimates of the current in the Chelsea River in the vicinity of the McArdle Bridge range from ⅕ to 1½ knots flowing downstream toward the harbor. Visibility was 15 miles and, at all times pertinent, the bridge was clearly visible.

6. After Captain Perkins boarded the TEXACO TEXAS, the CABOT stationed itself on the starboard side of the vessel and the WALTON, commanded by Captain Roscoe Stowe, stationed itself on the port. With the tugs alongside, the TEXACO TEXAS proceeded through Boston's Inner Harbor toward the Chelsea River.

7. Captain Perkins gave all helm and engine commands and also directed the operation and movement of the tugs by radio. Captain Perkins' orders were translated into Italian by Captain Barchi or the Third Mate and relayed to the helmsman responsible for the rudder settings and the crew members responsible for engine operations.

8. The TEXACO TEXAS proceeded without incident through the Inner Harbor to the mouth of the Chelsea River. At approximately 0458, Captain Perkins stopped the engines of the TEXACO TEXAS in order to slow the vessel. At approximately 0503, Captain Perkins ordered the vessel's engines placed on slow ahead. At some point between those two orders or shortly after the slow ahead order at 0503, Captain Perkins ordered the vessel's rudder hard starboard and the vessel began to turn to the starboard toward the mouth of the Chelsea River.

9. In order to properly pass through the channel beneath the McArdle Bridge, a vessel must make a gradual and almost continuous 90 degree turn to the right from a heading due north at the northern end of

Boston Harbor to a heading of almost due east under the bridge. Once through the bridge the vessel must continue turning slightly to the right in order to follow the course of the river.

10. The turn of the TEXACO TEXAS into the Chelsea River initially proceeded in a normal fashion. At approximately 0509, Captain Perkins ordered the engines on the TEXACO TEXAS stopped and ordered the Tug CABOT to cast off from the starboard bow and proceed ahead of the ship through the channel under the McArdle Bridge because of the narrowness of the draw. Shortly after releasing the CABOT, Captain Perkins ordered the rudder returned to hard starboard from the more midships position he had placed it in shortly before. Either Captain Barchi or the Third Mate translated the hard starboard command into Italian and relayed it to the helmsman of the TEXACO TEXAS.

11. Immediately after the hard starboard order was given, both Captains Perkins and Barchi observed that the vessel appeared to be coming to the left. In reality, based on the ship's course recorder trace,[1] I find that the vessel did not actually come to the left but ceased its turn to the right and steadied up on a straight line which gave the appearance of lefthand relative movement.

12. As the vessel straightened up, the WALTON was brought to full power against the port bow of the TEXACO TEXAS to attempt to keep the vessel on its turn to the right. Captains Perkins and Barchi then ordered the vessel's engines placed on slow ahead in order to increase the thrust of the vessel's propeller against the rudder and help bring the bow to the right again.

13. At approximately 0510 Captains Perkins and Barchi ordered the WALTON to leave the port side of the vessel because they feared that the tug would be crushed between the side of the ship and the approaching fender pier or concrete foundation of the McArdle Bridge. After the WALTON extricated itself, the TEXACO

1. A course recorder trace is a continuous graphical depiction of a vessel's heading in compass degrees which is produced by an electronic device onboard a ship.

TEXAS continued to turn slowly to the right but did not come to the right fast enough to avoid a collision with the upstream fender pier. Contact between the hull of the TEXACO TEXAS and the upstream fender pier occurred in the vicinity of the bridge operator's house just to the east of the bridge. In addition, the rail of the TEXACO TEXAS made contact with a portion of a sidewalk on the bridge structure.

14. Based on all of the evidence, I find that until approximately one and one-half minutes before the accident the approach of the TEXACO TEXAS to the McArdle Bridge was normal. I further find that, at that point, the vessel steadied up on a course headed for the fender pier because the vessel's rudder was placed to the port instead of to the starboard as ordered by Captain Perkins shortly after 0509; and this as a result of Captain Barchi or the Third Mate's error in translating Captain Perkins' hard starboard order from English to Italian.

The Coast Guard made a similar finding in its investigation of the accident. Defendant TEXACO TEXAS poses another explanation for the collision. Texaco argues, first, that all rudder and engine orders given by Captain Perkins were, in fact, correctly carried out. Second, Texaco notes that the TEXACO TEXAS was correctly lined up in the channel 200 feet from the McArdle Bridge. Third, Texaco states, correctly, that the course recorder trace aboard the TEXACO TEXAS never showed the ship actually more to the left. Based on the above, Texaco contends that "[t]he only explanation for the consistent and undisputed testimony of all eye witnesses to the affect [sic] that the vessel appeared to come to the left ... is that the vessel set laterally through the water, thereby giving the appearance to those on the bridge ... and those alongside the vessel on the WALTON that the vessel's bow was in fact moving left." Texaco argues that the effects of the wind and the ebb tide on the vessel caused this lateral set.

While it is not physically impossible for a 625 foot ship to move sideways as a result of current and wind, defendant's explanation is somewhat far-fetched and unsupported by the facts of the case. First, there is substantial evidence, including a Coast Guard accident report, to support a finding that a rudder command was misinterpreted and the rudder set to port instead of starboard. Captains Perkins, Stowe, and Kradolfer testified credibly to this.

Second, Texaco misconstrues Captain Stowe's testimony that the vessel was lined up correctly in the channel 200 feet before the McArdle Bridge. Essentially, all that Captain Stowe meant by this testimony was that the ship was lined up correctly in its approach to the bridge *up until* the point at which the vessel ceased its gradual turn to the right and appeared to move left.

Third, Texaco's contention that current and wind caused the 625 foot vessel to shift laterally is also not supported by the facts. At most the current was ebbing at 1.5 knots and more credible testimony puts it at less than a knot. Captains Stowe and Perkins testified that current was not a factor in the collision. Furthermore, shiphandling experts testified that an ebb current would improve the stearage of a ship going upstream rather than hinder it. Also, there was no evidence that the current flowed in such a way as to produce a lateral set. Finally, there was no evidence that the wind at the time of the collision was of a sufficient magnitude and direction to cause or contribute significantly to a lateral set.

Texaco's explanation for the collision must be rejected. It starts with premises that are unsupported by the evidence and reaches a conclusion that is implausible at best.

15. I find that the tugs CABOT and WALTON carried out the orders of docking master, Paul Perkins, properly and that no portion of responsibility for the accident is attributable to them or the action of their crews. Captain Perkins' placement of the tugs on the bow of the TEXACO TEXAS during the approach to the McArdle Bridge

was correct and proper. Although, in retrospect, the situation might have been improved if the greater horsepower of the CABOT had been available on the ship's port bow, I cannot find that placing the tug on that side would have avoided the collision.

16. The downstream half of the Chelsea fender pier was entirely missing on the day the TEXACO TEXAS collided with the upstream half of the pier. I find that the absence of the downstream fender pier was not and could not have been a contributing cause of the collision or the resulting damage. In fact it is likely that the absence of the downstream fender pier allowed the tug WALTON to push up on the port side of the TEXACO TEXAS longer than if the fender pier had been there and thus reduced the severity of the collision.

17. The fender piers which were present (upstream Chelsea pier and both sides of the East Boston pier) had marker lights which were working properly. The bridge spans in question had navigation lights which marked the channel through the bridge when the spans are raised. The bridge and its fender pier were clearly visible to Captains Perkins, Barchi, Stowe and others navigating the TEXACO TEXAS. Since the bridge and its fender piers were marked and clearly visible, the absence of the downstream fender pier marker light (absent because the downstream fender pier was missing) was not and could not have been a contributing cause of the collision.

18. The flared end or "wing" of the upstream Chelsea fender pier lies outside the channel formed by the fender piers of the bridge and in no way obstructed the navigation of the TEXACO TEXAS through the bridge. The court finds that the wing of the upstream fender pier was not and could not have been a contributing cause of the collision.

19. Some time after the TEXACO TEXAS was built, the vessel was modified by the addition of a six (6) foot bulbous protrusion below the waterline at the bow of the ship. I find that the TEXACO TEXAS

collided with the upstream fender pier at an angle and in a manner that was sufficient to bring this bulbous bow into contact with the upstream fender pier. This finding is based on two facts which plaintiff has proved by a preponderance of the evidence.

First, the court finds that an angle of 17° between the ship and the face of the pier was more than sufficient to place the bulbous bow in contact with the fender pier piles. The angle of collision measured 17° or greater. Captains Barchi and Perkins, in their post-accident reports, indicated angles of collision well in excess of 17°. Mr. Mount, who did a diagrammatic analysis of the accident calculated an angle of 17°. Furthermore, in order for the tug WALTON to have been between the TEXACO TEXAS and the bridge until moments before the collision, the TEXACO TEXAS had to have been at a significant angle to the fender pier at the time of the collision. Finally, if the angle of impact had been as slight as defendants contend, the bridge sidewalk would have been pushed upstream by the ship instead of being pushed inward, and the area of damage along the ship's hull would have been greater than the ten feet documented by TEXACO TEXAS' shipyard repair request.

Plaintiffs proffer the course recorder trace (CRT) as additional evidence that the TEXACO TEXAS collided at an angle sufficient to bring the bulbous bow into contact with the upstream fender pier piles. It is undisputed, however, that the CRT aboard the TEXACO TEXAS had an internal time error which precludes an accurate direct reading of the ship's heading at the time of the collision. I find that the proffered corrections for the time error are not sufficiently substantiated and reliable to allow a credible calculation of the angle of collision to be made from the CRT. Adding to this conclusion are other possible sources of error testified to by plaintiff's witnesses including compass error, transmission error, and trace synchronization error. Even without a reliable angle of collision calculable from the CRT, there is enough credible

evidence discussed *supra* to conclude that the angle of collision was sufficient to bring the bulbous bow into contact with the upstream fender pier piles.

Second, plaintiff has demonstrated by a preponderance of the evidence that the pattern of breaks in the piles along the channel face of the fender pier could only have been caused by a vessel with an underwater protrusion such as a bulbous bow. No evidence was presented indicating that other ships which have struck the Chelsea fender pier either before or after the collision of the TEXACO TEXAS had an underwater hull protrusion which would cause the pattern of breaks found in the piles underwater in the upstream fender pier. Many of the piles found broken along the channel face of the fender pier were broken in three places, with the middle break corresponding to the location of the maximum horizontal extension of the TEXACO TEXAS' bulbous bow. The upper and lower breaks in the piles correlate with the individual piles being broken first in the middle by contact with the bulbous bow and then the separated halves being bent to the breaking point where they were attached to the pier and the bottom of the river. The court finds that the damage to the fender pier identified *infra* is uniquely related to the hull configuration—in particular, the bulbous bow—of the TEXACO TEXAS and the height of the tide and draft of the ship at the time of the collision.

20. I find that the TEXACO TEXAS, and particularly its bulbous bow, caused damage to the upstream fender pier principally between bents 6 and 29. More specifically, the vessel damaged the deck of the pier, stringers, cap beams, horizontal and diagonal bracing, wales and blocks, and most significantly a large proportion of the fender pier piles. To date this damage has not been repaired. I also find that the TEXACO TEXAS damaged the fender pier

sidewalk. This damage was repaired in 1979.

21. I find that $225,000 is a fair and reasonable assessment of the damages to the TEXACO TEXAS. In reaching this figure I have relied on, *inter alia,* the 1979 estimate of damage prepared by Universal Engineering Corporation, the 1983 summary of three contractors' estimates of repair costs, and the expert testimony of Messrs. Wentworth, McCluskey, Masotta, Barrett and others. I have given weight to, *inter alia,* evidence of damage to the fender pier caused by other vessels; testimony indicating that the company which provided the lowest of the three repair bids is a competent marine contractor; expert opinions on the proper contingency fee for marine repair contracts ranging between 10% and 30%; expert opinions indicating the need for temporary dolphins during the repair process; evidence of the need for a condition survey and engineering services prior to repair of the fender pier; evidence that the necessary repairs do not create a better type of fender pier or extend its useful life. Finally, I have included in the damage figure the costs of work already performed as indicated on Exhibits 34 and 63.

## CONCLUSIONS OF LAW

▇▇▇ The law is well settled that a moving vessel which strikes a stationary object such as a pier is presumptively at fault. *The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895); *Merrill Trust Co. v. Bradford,* 507 F.2d 467, 470–71 (1st Cir.1974); *Port of Seattle v. M/V Saturn,* 562 F.Supp. 70, 72 (W.D.Wash. 1983). This presumption of fault "operates against all parties participating in the management of the vessel at the time of the contact." *Merrill Trust,* 507 F.2d at 470–71. To overcome this presumption, the moving vessel must show that the collision was "inevitable" or that the stationary object was somehow at fault.[2] *Bangor &*

---

**2.** Defendants contend that the presumption of fault is subject to Fed.R.Evid. 301 and therefore while the burden of going forward with the evidence to rebut the presumption is on defendants, the ultimate burden of persuasion regard-

ing liability remains with the plaintiff. *City of Boston v. Texaco, Inc.,* 1977 A.M.C. 1773, 1781 (D.Mass.1982). Plaintiffs, however, argue that the presumption of fault is a substantive rule of admiralty law not subject to Rule 301 and there-

*A.R. Co. v. Ship Fernview*, 455 F.Supp. 1043 (D.Me.1978) *citing The Oregon,* 158 U.S. at 197, 15 S.Ct. at 809, Griffin, *The American Law of Collision* § 145, at 348 (1949). In the instant case, the court has found that the accident was the result of a mistranslation of rudder commands given by Captain Perkins to the helmsman. The court has also found that Texaco's alternative explanation for the accident—that it was the result of an unavoidable lateral movement of the vessel caused by wind and current—has no basis in fact. Therefore defendants have failed to prove that the accident was inevitable—one of the two bases for overcoming the presumption of fault.

Defendant also alleges that the fender pier was in violation of certain statutory requirements and therefore at fault in the collision—the second basis for overcoming the presumption of fault. Specifically, Texaco contends that the absence of the downstream fender pier, the absence of navigational lights on the downstream fender pier, and the presence of an allegedly illegal fender pier "wing" violated various navigational statutes.

■ In admiralty law, under the so-called "Pennsylvania Rule," if a party violates a statutory rule intended to prevent collisions, then it has the burden of proving that its violation was not and could not have been a contributing cause of the collision. *The Pennsylvania,* 86 U.S. (19 Wall) 125, 136, 22 L.Ed. 148 (1874); *Dow Chemical Company v. Dixie Carriers, Inc.,* 330 F.Supp. 1304, 1308–09 (S.D.Texas 1971), *aff'd.* 463 F.2d 120 (5th Cir.1972). Essentially, under the Pennsylvania Rule, if a bridge or pier which has been struck by a moving vessel is in violation of a navigational statute, then the normal presumption of fault that attaches to the vessel is shifted to the stationary structure. "While such a structure may not be injured negligently by a passing vessel with impunity,

nevertheless the vessel which strikes it is not presumptively negligent or careless, but the bridge owner is presumptively at fault, unless he can show that the failure to comply with the requirements was not one of the factors or causes which contributed to the injury." *United States v. Norfolk-Berkley Bridge Corp.,* 29 F.2d 115, 125 (E.D.Virginia 1928).

■ In the instant case the absence of the downstream fender pier was not a statutory violation invoking the Pennsylvania Rule since the downstream fender pier was designed to protect the bridge and not to prevent ships from striking the upstream fender pier, the pier at issue in this case. *See generally Union Oil Company of California v. Tugboat San Jacinto,* 409 U.S. 140, 146, 93 S.Ct. 368, 372, 34 L.Ed.2d 365 (1972) (fault based on the violation of a navigational rule must have some relationship to the dangers against which the rule was designed to protect.) Even assuming the absence of the downstream fender pier was a statutory violation invoking the Pennsylvania Rule, plaintiff's burden under the rule has been met since the court has found that the absence of the fender pier was not a contributing cause of the injury.

Similarly, the absence of the downstream fender pier marker light was not a violation of any statute or duty. Pursuant to 33 C.F.R. § 118.80(c) "[e]very bascule bridge shall be lighted so that each and every pier, or protection pier where provided in or adjacent to navigable channels under the lift spans will be marked by a red light." In the absence of the fender pier, there was no statutory duty or need for such a marker light. Even assuming that the absence of the downstream fender pier marker light was a statutory violation, the burden of the Pennsylvania Rule has been met since the court has found that the absence of the light was not a contributing cause of the injury.

fore both the burden of going forward and the ultimate burden of persuasion rests with the defendants. *James v. River Parishes Co., Inc.,* 686 F.2d 1129, 1132 and 1132 n. 2 (5th Cir.1982).

Whichever position the court adopted in the instant case, its ruling on liability would be the same. Therefore, the court declines to decide the issue.

■ Finally, with regard to the legal status of the flared end of the upstream fender pier, the court has already determined that the flared end was not and could not have been a contributing cause of the collision. Therefore the court need not and does not reach the issue of whether the pier was in violation of any navigational statute. *The Pennsylvania,* 86 U.S. at 136. A pier which does not obstruct a vessel's passage is not a contributing cause of a collision merely because if it had not existed it would not have been struck. *Dow Chemical,* 463 F.2d at 122.

Turning to the crossclaims, the court has already found that the Boston Towboat tugs WALTON and CABOT carried out their orders properly and that no fault with respect to any aspect of the collision can be attributed to them. Therefore, any liability for the damage caused by the TEXACO TEXAS which defendant Boston Towboat bears to the City of Boston derives solely from its position as the employer of the docking master, Captain Perkins. Boston Towboat argues, however, that any liability of Captain Perkins is entirely attributable to defendant Texaco by virtue of the pilotage clause contained in Boston Tow's rate schedule. See *supra* at 1134.

The court has already found that Texaco's business agent, who made arrangements with Boston Tow for tug assistance, knew that the pilotage clause was in Boston Tow's rate schedule and that the clause contained customary language used throughout the industry. It is clear, then, that the pilotage clause was an explicit part of the contract between Boston Tow and Texaco for tug assistance and that Texaco was aware of it.

The pilotage clause has been upheld and applied in numerous instances where it was a part of a contract for towboat assistance. The leading case is *Sun Oil Co. v. Dalzell Towing Co.,* 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932) in which the U.S. Supreme Court upheld the validity of a clause substantially similar to the one here at issue and refused to hold the tug company liable for errors of the docking master. The clause has also been upheld and applied on at least three occasions by courts in the First Circuit. *Portland Pipeline Corp. v. M/V Barcola,* 1982 A.M.C. 2725, 2727–28, 2734–35 (D.Me.1982) (Mazzone, J.), *Nippon Yusen Kaisha v. Zephyr Shipping Corp.,* 1971 A.M.C. 949 (D.Mass.1970) (Wyzanski, J.); *National Distillers Products Corp. v. Boston Tow Boat Company,* 134 F.Supp. 194 (D.Mass.1955) (Aldrich, J.).

■ Defendant Texaco, in attempting to escape the weight of case law upholding the pilotage clause, argues, first, that the pilotage clause violates public policy because it is exculpatory in nature and, second, that it is a contract of adhesion because of Boston Tow's alleged monopoly of tow boat services in Boston Harbor. The Ninth Circuit recently considered and rejected the first argument in *Kane v. Hawaiian Independent Refinery, Inc. v. Aegean Seaways Co., S.A.,* 690 F.2d 722, 724 (9th Cir.1982):

Aegean also argues that public policy considerations compel placing liability on the company that hires, trains, assigns, and pays the harbor [*sic*] masters, and requires their use on all incoming vessels. We find this argument unpersuasive. The Supreme Court has recognized and underscored the distinction between a release-from-negligence clause, which public policy opposes, and a pilotage clause of the type at issue here. *Compare Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 94, 96 [75 S.Ct. 629, 634, 635, 99 L.Ed. 911] (1955), with *Sun Oil,* 287 U.S. at 294 [53 S.Ct. at 136].

The court finds the distinction drawn by the Supreme Court in *Bisso, id.,* fully applicable to the instant case and therefore is unpersuaded by the public policy argument.

Defendant's second argument is essentially that enforcement of the pilotage clause under the circumstances of this case would be improper because Boston Tow allegedly enjoyed a monopoly on the provision of pilotage and towage services in Boston Harbor and therefore Texaco had no alternative but to accept the terms of

the clause if it wished to dock its vessel. Former Chief Judge Wyzanski of the District of Massachusetts responded to the very same contention in *Nippon Yusen Kaisha,* 1971 A.M.C. at 954 (D.Mass.1970) as follows:

> But counsel urged that Judge Aldrich's opinion [in *National Distillers Products Corp. v. Boston Tow Boat Company,* 134 F.Supp. 194 (D.Mass.1955)] is inapplicable because in the case at bar the exculpatory clause is sought to be applied by a tug boat company that has what laymen would call a monopoly on the business of undocking tankers in the Port of Boston. It is true that in the last decade in Boston virtually all undocking of tankers has been done by tugs and tug boat captains supplied by Boston Tow Boat Company. But the company has not had a monopoly by law or license. Nor is there any evidence that it has had an intent to exclude competition, or that it has engaged in exclusionary acts. Moreover, there is no obstacle to a tanker engaging the services of a Boston competitor, Ross Tow Boat Company, which although it had only in 1969 [*sic*] one tug suitable for towing a tanker, could have procured from the United States Navy and others suitable tugs and could have found captains suitable to act as undocking masters. In short, the situation is one in which tankers are not absolutely dependent on the Boston Tow Boat Company, but in practise tend to look to that company because no other company has found the market sufficiently attractive to be instantly ready for services, and alternatives to the services offered by Boston Tow Boat Company must be improvised. Under these circumstances the exculpatory clause may be against public policy. But no case has yet gone that far. If exceptions are to be created to the [*National Distillers*] doctrine, they are best made by an appellate court.

The court finds Judge Wyzanski's reasoning fully applicable to the instant case. If anything, the testimony at trial established that the range of tug boat and pilotage services available to TEXACO in 1979 were greater than these described by Judge Wyzanski in 1970. Thus Texaco's monopoly argument must be rejected.

The court rules that the pilotage clause is valid and enforceable by Boston Tow against Texaco. Enforcing the clause has two effects. First, Boston Tow is insulated from liability to Texaco for acts or omissions by Captain Perkins while he was acting as docking master. Second, the clause obligates Texaco to indemnify Boston Tow for all liability to third parties imposed on Boston Tow as a result of acts or omissions by Captain Perkins.

■■■ Boston Tow argues that, in addition to indemnification for damages, it is entitled to the attorneys' fees it incurred in defending against the city's claims. Generally, in admiralty cases, attorneys' fees are not awarded. *Platoro Ltd., Inc. v. Unidentified Remains, Etc.,* 695 F.2d 893, 905 (5th Cir.1983). An exception to this rule, however, "allows attorneys' fees to an indemnitee as against his indemnitor—not as attorneys' fees *qua* attorneys' fees, but as part of the reasonable expenses incurred in defending against the claim." *Noritake Co., Inc. v. M/V Hellenic Champion,* 627 F.2d 724, 730–31 n. 5 (5th Cir.1980). The court finds this exception applicable to the instant case and rules that Boston Tow is entitled to the attorneys' fees it has incurred in defending against the plaintiff's claims. *See Moran Towing & T. Co. v. Navigazione Libera Triestina, S.A.,* 92 F.2d 37, 38, 41 (2d Cir.1937).

■■■ The final issue concerns the extent of prejudgment interest plaintiff is entitled to on its award. The purpose of awarding interest to a party recovering a money judgment is to compensate the wronged person for being deprived of the monetary value of the loss from the time of the loss to the payment of the money judgment. *Turner v. Japan Lines, Ltd.,* 702 F.2d 752, 756 (9th Cir.1983). The general rule in collision cases in admiralty is that interest is awarded from the date of the

actual casualty or loss. *United States v. M/V Zoe Colocotroni*, 602 F.2d 12, 13 (1st Cir.1979) *citing Moore-McCormack Lines v. Amirault*, 202 F.2d 893, 898 (1st Cir. 1953). In the instant case the court finds this rule fully applicable. Defendants argue that plaintiff was dilatory in its filing of the suit almost three years after the collision and that award of prejudgment interest from the date of the collision is therefore unfair. The court finds, however, that plaintiff devoted a significant portion of the period prior to filing of the suit to diligent attempts at analysis of the accident and negotiation and settlement of the claims. The court rules, therefore, that the delay is not an "exceptional circumstance" justifying denial of interest. *See National Bank v. Material Service Corp.*, 597 F.2d 1110, 1121 (7th Cir.1979) ("Extraordinary delay in commencing or prosecuting a claim has been held an exceptional circumstance justifying denial of interest"). Defendant is thus entitled to interest on the judgment from the date of collision, January 15, 1979.

Determination of the applicable rate of interest in admiralty cases is within the discretion of the trial court. *Independent Bulk Transport, Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 25 (2d Cir.1982). Plaintiff is entitled to income which monetary damages would have earned, and such should be measured by interest on short-term, risk-free obligations. *Id.* at 27. The interest rate on short-term, risk-free obligations, such as U.S. Treasury Notes, has averaged at least 9% since January, 1979. Prejudgment interest will therefore enter at the rate of 9%.

Accordingly, judgment in full will enter against defendant Texaco for $225,000 plus prejudgment interest of 9% calculated from January 15, 1979. Additionally, defendant Texaco is liable to defendant Boston Tow for attorneys' fees in an amount already stipulated to by the parties.

SO ORDERED.