**MARCIAL UCIN, S.A. et al., Plaintiffs,**

v.

**SS GALICIA et al., Defendants,**

v.

**COMPANIA DE NAVEGACION SOMERSET, S.A. et al., Defendants and Third Party Plaintiffs,**

v.

**PEREZ Y COMPANIA et al., Third Party Defendants.**

**Civ. A. No. 74–1705–A.**

United States District Court,
D. Massachusetts.

Jan. 5, 1983.

---

Richard A. Dempsey, Glynn & Dempsey, Boston, Mass., for plaintiffs.

William B. Sleigh, Jr., Putnam, Bell & Russell, Boston, Mass., for third party Jos Irwin Inc.

Thomas H. Walsh, Jr., Frank Sally, Bingham, Dana & Gould, James B. Re, Boston, Mass., for defendants.

Frank Handy, Kneeland, Kydd & Handy, Richard Kydd, Boston, Mass., for Iberbroker.

## OPINION

BAILEY ALDRICH,* Senior Circuit Judge.

This is another chapter in the case of the lost steel turnings on board the SS GALI-CIA, a vessel of Panamanian registry, owned by Compania de Navegacion Somerset (Somerset), time chartered to Perez y Compania, subchartered to Iberbroker S.A., in turn voyage chartered to Teccomex, S.A. Suit was brought against the ship and all of the above, except Teccomex, by Marcial Ucin, S.A. and Schiavione Chase Corp. (Chase), for loss of the turnings by fire, after loading. The term fire is used loosely, and without bearing on an issue sought to be raised at the trial. The simple fact is that the turnings, after loading, became so hot as to be autophagous. Chase was the shipper and initial owner of the turnings, and Ucin the ultimate owner. For present purposes they are treated as one, Chase. Certain cross claims were made by defendants, some against other parties no longer before the court. After trial, plaintiffs' action was ordered dismissed, the court finding that the turnings, a hazardous cargo (46 C.F.R. Part 146, § 146.27–28) (1975), self-ignited, and that no party was at fault. No judgment was entered. Thereafter, plaintiffs moved the court that they were entitled to recover advances made in connection with endeavoring to extinguish the fire (fire costs) and to discharge the turnings when that proved impossible (discharge costs). This sparked further claims. The pleadings have been amended, and these claims must be disposed of.

It is recognized, as a matter of course, that the loading process causes turnings to heat. The ship is not permitted to sail until the temperatures are monitored and found to lower to a certain point, this often requiring a number of days. Unfortunately in this case, after a time the initially descending temperatures unexpectedly reversed. In spite of all efforts, including massive infusions of $CO_2$ effected by Chase with the consent, if not orders, of the mas-

ter, the temperatures continued to rise, and when, eventually, it became clear that there was no hope of arresting the rise, the Coast Guard required the cargo to be lightered and dumped at sea.

All of this involved a great deal of expense. The fire costs, in the amount of $36,536 for $CO_2$, and monitoring, $9,747, were paid by Chase. The discharge costs were paid by Chase, Iberbroker, and Somerset pursuant to an agreement entered into after the fire costs were incurred, the presently material provisions of which were as follows.

7. The discharge of the cargo of metal turnings from the M/V GALICIA shall be pursuant to the terms of the Charter Party between Compania De Navegacion and Perez dated 6, April, 1973.

8. IT IS FURTHER UNDERSTOOD AND AGREED that the advancement of costs and expenses involved in the discharge of cargo from the M/V GALICIA is without prejudice to any rights of the parties and does not constitute an admission of liability on the part of any party to this agreement.

9. IT IS ALSO UNDERSTOOD AND AGREED that by the execution of this agreement, no party thereto relinquishes its right to sue, implead or otherwise maintain a cause of action, in law, equity, or arbitration against any of the other parties involved.

This agreement was drafted to bind Somerset, Chase, Perez, and Iberbroker, with one "attorney," a Mr. Kydd, to sign for the last two jointly. Before signing, however, he excised the name Perez in the signature line and signed only for Iberbroker. On this record I must find Perez not to be a party. Iberbroker's representation in an earlier paragraph that it was Perez's agent does not bind Perez, particularly under such circumstances.

In spite of spasmodic contentions to the contrary, this was a non-waiver agreement. However, I find and rule, on the record as a whole, that, if contributions to the turnings

* Sitting by designation.

discharge were such as normally to create a lien, Somerset had prior knowledge and did not object and cannot now be heard to say that the lien was invalid.

Pursuant to the agreement, each of the three parties initially advanced $33,333. Chase made further payments, its total, on account of discharge, being $83,333. Somerset made discharge payments in the total amount of $185,833; Iberbroker's remained at $33,333.

■ Chase claims a lien against the vessel for its total expense, viz., $129,616, as necessary services. No one has sought to distinguish between fire costs and discharge costs, and perhaps I am borrowing trouble. However, so far as the ship was concerned, except for inconsequential charring of a few trimboards, the fire was occasioning no harm thereto. Chase owned the turnings and was endeavoring to preserve them. It seems inappropriate for Chase to acquire a charge against the vessel for its costs in attempting to save its own property when there was no fault or responsibility on the part of the vessel. Although it might be to the vessel's advantage to have the fire put out, primarily these were not services furnished it, and there seems no basis for a lien in Chase's favor. *Cf. Auditore Contracting Co. v. Coal on Barge Mary McAllister,* E.D. N.Y., 1924, 295 F. 694, 695 (stevedore services rendered to cargo—and not to vessel—did not give rise to lien.) I so hold irrespective of Somerset's special defense under the Fire Statute, so-called, 46 U.S.C. § 182, not reached, then or now.

■ The discharge costs are another matter. The removal of the overheated turnings was ordered by the Coast Guard before it would give permission to clear, a manifest necessity so far as the ship was concerned. *Cf. The Susquehanna,* D.Mass., 1923, 3 F.2d 1014. Legally, removal was not Chase's responsibility, the fire not having been its fault and the vessel having authorized the carriage of this hazardous cargo, for which Chase, incidentally, paid an extra charge. A lien for its services to the ship was appropriate. *See Farrell Ocean Services, Inc. v. United States,* 1 Cir., 1982, 681 F.2d 91.

■ At the same time, under the initial charter, Perez agreed to pay all "discharge costs," and to return the vessel "shovel clean." Perez was authorized to subcharter, but only with the understanding that this would not relieve it of its obligations. Iberbroker assumed the same obligations under its subcharter. Its citation of *The Rangoon Maru,* 2 Cir., 1928, 27 F.2d 722, is not in point. Somerset must be permitted to sue Iberbroker direct, and failure to obtain judgment against Perez should not be a defense.** *Cf. Demsey & Associates v. SS Sea Star,* 2 Cir., 1972, 461 F.2d 1009.

It is also no defense to Iberbroker that Teccomex may also be liable under the voyage charter. Nor is it a defense that these were unusual discharge costs; there is no possible ambiguity with respect to the obligation under the charter to return the vessel "shovel clean." This would have to be effected sometime before the end of the charter. It follows that while Chase is entitled to recover $83,333, plus interest, from Somerset, Somerset is entitled to recover from Iberbroker the amount paid to Chase, plus Somerset's own disbursements of $185,833 and interest.

■ Somerset seeks recovery also against Perez. Perez and Iberbroker are Spanish corporations, with no apparent connection with Massachusetts other than whatever was involved in this single visit of the S.S. GALICIA. Proper substituted service, so-called, was made on each. Thereafter both employed the same counsel to file a motion to dismiss for lack of jurisdiction. In spite of this motion, and before pursuing it—indeed, it never has pursued it—Perez attended the taking of a number of depositions. For reasons of its own, Somerset obtained a hearing on Iberbroker's motion, only, a judge of this court thereafter writing an extensive opinion by which it found jurisdiction, and denied the motion. Thereafter Somerset proceeded as if the court had jur-

** But see, post.

isdiction over Perez as well. When this court questioned the propriety of this, Somerset filed interrogatories to Perez, limited to jurisdictional issues. Perez did not respond. On September 16, 1982, a notice of delinquency was entered for failure to respond. Although notice in a number of ways was given to and through Perez's original counsel, Perez, again, has not responded.

Happily for Somerset, the Court has given it a timely lift. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). On the basis thereof, and the foregoing circumstances, including some of record not fully set forth herein, the court orders a final default against Perez. It accordingly, on the same basis and reasoning, orders judgment against Perez in the same amount as that ordered against Iberbroker. Iberbroker has been fully defended; indeed by the same counsel originally retained by Perez. There is no reason to suppose that the Perez result could be any different.

## INTEREST

■ The admiralty court is not bound by the Massachusetts statute and, in light of interest inflation, a higher figure would seem appropriate. In *Sabine Towing & Transportation Co. v. Zapata Ugland Drilling, Inc.,* 5 Cir., 1977, 553 F.2d 489, *cert. denied,* 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 the court awarded 12% from 1974. Zapata apparently introduced evidence of its cost to borrow; Chase has not done so. However, the prime rate, to a considerable extent, has been a matter of common knowledge for some time, as being well in excess of 12%. An average of 12% would seem minimal. Furthermore, where this was for cash advances, annual compounding is in order.

■ Chase also wishes attorneys' fees. There is nothing exceptional about this case, and Chase lost its original substantive claim. There will be no allowance in favor of or against any party.