CITY OF BOSTON, Plaintiff, Appellee,

v.

S.S. TEXACO TEXAS, Her Engines, Boilers, Etc., et al., Defendants, Appellees,

Texaco Panama, Inc., Defendant, Appellant.

No. 84-2053.

United States Court of Appeals, First Circuit.

Argued May 8, 1985.

Decided Sept. 26, 1985.

William Dodds, Boston, Mass., with whom David S. Mortensen, Nelson W. Cunningham and Hale and Dorr, Boston, Mass., were on brief for appellants.

John R. Devereaux, Asst. Corp. Counsel, City of Boston Law Department, Boston, Mass., for City of Boston.

James F. McHugh, Boston, Mass., with whom James B. Re and Bingham, Dana & Gould, Boston, Mass., were on brief for Boston Tow Boat Co.

Before COFFIN and TORRUELLA, Circuit Judges, and WYZANSKI,* Senior District Judge.

TORRUELLA, Circuit Judge.

This case is before us on appeal by defendants SS TEXACO TEXAS and its owner, Texaco Panama, Inc. (collectively "Texaco") from a judgment of the United States District Court for the District of Massachusetts, 599 F.Supp. 1132, for damages that occurred when the ship collided with the McArdle Bridge, property of plaintiff-appellee, the City of Boston. At the time of the collision, the TEXAS was being assisted by two tug boats belonging to defendant-appellee Boston Tow Boat Company ("Boston Tow"). A Boston Tow tug captain was serving as docking master.

Shortly before dawn on January 15, 1979, the TEXAS, a single-screw oil tanker with an overall length of 630 feet and a beam of 85 feet, entered Boston Harbor en route to the Texaco fuel dock in the Chelsea Creek, at Chelsea, Massachusetts. As requested by Texaco, the ship was met by two tugs belonging to Boston Tow, the CABOT and the WARTON. The master of the CABOT, Captain Paul Perkins, boarded the TEXAS to serve as docking master. He proceeded to the ship's bridge where he met the vessel's master, Captain Luigi Barchi.

With both tugs secured alongside, and with Captain Perkins in command, the TEXAS proceeded through the Inner Harbor toward the mouth of the Chelsea Creek. On the bridge with Perkins and Barchi were the third mate and a helmsman. Perkins gave all helm and engine commands and directed the tugs by radio. Captain Barchi, whose native language is Italian but who also spoke English, translated Perkins' orders into Italian for relay to the appropriate crewmembers.

In order to enter the Chelsea Creek and pass under the McArdle Bridge, a vessel must make a ninety degree turn to starboard from a heading of almost due north to one of almost due east. According to all eyewitnesses, the approach of the TEXAS to the draw of the McArdle Bridge was normal in all respects. The TEXAS was in mid channel and properly on course. However, when the ship reached a point about 200 to 300 feet from the bridge, its bow suddenly came to port and headed toward the bridge. Despite the best efforts of Captain Perkins and the crews of both the ship and the assisting tugs, the TEXAS struck the northern side of the bridge, damaging the wooden fender pier that protects the bridge abutment and the bridge sidewalk. The district court found that a mistranslated order just prior to the collision caused the ship's sudden swing to port.[1] The court concluded that Texaco was liable to pay $225,000 in damages plus 9% in prejudgment interest, calculated from the date of the collision. Additionally, under the so-called "pilotage clause" in the towage agreement between Texaco and Boston Tow, the court awarded Boston Tow its attorneys' fees in an amount stipulated by the parties.

*The OREGON Rule*

At trial, Texaco claimed that there was no rudder error, and that the only plausible explanation was lateral drift caused by wind and current.

The court relied on testimony of Captain Perkins, Captain Stowe of the tug WARTON, and the City's expert witness on ship-handling, Captain Kradolfer. Additionally, explanations made to the Coast Guard in-

---

* Of the District of Massachusetts, sitting by designation.

1. The district court found that the collision occurred because "the vessel's rudder was placed to port instead of starboard as ordered by Captain Perkins shortly after 0509 hours; and this [was] a result of Captain Barchi or the Third Mate's error in translating Captain Perkins' hard starboard order from English to Italian."

vestigator within an hour of the accident supported a conclusion of rudder error. The testimony of Captain Perkins takes on added credibility when one remembers that his initial report of rudder error was against the interests of both of his employers—Boston Tow and Texaco—since liability for the ship's fault would rest with one or both of them.

■ The rule is well settled that when a vessel under its own power collides with an anchored vessel or a navigational structure, the burden of proving absence of fault or *vis major* rests on the pilot vessel. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1894); *The Virginia Ehrman,* 7 Otto (97 U.S.) 309, 315, 24 L.Ed. 890 (1877); *The Clarita,* 23 Wall. (90 U.S.) 1, 13, 23 L.Ed. 146 (1874); *James v. River Parishes Co., Inc.,* 686 F.2d 1129, 1132 (5th Cir. 1982); *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 794–95 (5th Cir.1977); *Carr v. Hermosa Amusement Corp. Ltd.,* 137 F.2d 983 (9th Cir.1943). The district court, therefore, placed the burden of proving inevitable accident on Texaco. Texaco challenges this as error, arguing that under Federal Rule of Evidence 301, the burden of proof remains on the owner of the stationary object. We disagree. We are dealing with a substantive principle of admiralty law, not a general rule of adjective law. The question of whether this substantive principle is governed by Rule 301 was answered by the Fifth Circuit in the following manner:

> It is not governed by Rule 301.... The weight and effect of such a presumption is determined, as a matter of substantive law, in the light of the considerations that prompted its adoption....
>
> Here, of course, we neither create nor modify a presumption, but merely apply a rule that long antedated adoption of the Federal Rules of Evidence. In doing so, we act in conformity [with] the traditional responsibility of the federal courts to enunciate and develop the substantive principles of admiralty and maritime law.

[Citations omitted]. The allocation of burdens we apply today have been fashioned by the federal courts under the authority of Article III of the Constitution. In addition to the factors we have discussed that make this allocation of burdens logical, we would be reluctant to hold that the adoption of the Rules of Evidence altered such a principle. *James v. River Parishes Co., Inc.,* 686 F.2d 1129, 1133 (5th Cir.1982). We believe that the Fifth Circuit's ruling is correct, and thus hold that the rule that a vessel colliding with a navigational structure has the burden of proving that the collision was an inevitable accident or *vis major,* which human skill and precaution and a proper exercise of nautical skill could not have prevented, continues in effect after the enactment of the Federal Rule of Evidence. *See Petition of the United States,* 425 F.2d 991, 995 (5th Cir.1970); *Pasco Marketing Inc. v. Taylor Towing Serv., Inc.,* 554 F.2d 808 (8th Cir.1977).

Texaco presented evidence in an effort to prove that the sudden leftward movement of the TEXAS and the subsequent collision were not the fault of the vessel or its crew, but were caused by an unavoidable lateral set resulting from a combination of gusting winds and an ebb current. The trial judge specifically found that there was no evidence that either the wind or the current at the time of the collision were of sufficient magnitude or unusual direction to support Texaco's explanation for the collision.

■ The record is rife with conflicting evidence supporting and refuting each party's theory of the accident. Rule 52(a) of the Federal Rules of Civil Procedure specifically requires that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Considering that the court's findings of fact are not clearly erroneous, we must, therefore, conclude that Texaco did not meet its burden of persuasion.

## The Pilotage Clause

The district court ordered Texaco to reimburse codefendant Boston Tow for its attorneys' fees, finding authority to do so in the language of the "pilotage clause," which the court found to be part of the contract between the two companies.[2]

Texaco attacks the validity of the pilotage clause alleging that it is actually an exculpatory clause that contradicts public policy. It urges that we reexamine *Sun Oil v. Dalzell Towing Co.*, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932), the Supreme Court decision which sanctioned this clause.

The situation of the agreement in *Sun Oil* directly parallels the facts of the case at bar:

> ... in anticipation of the arrival of the Sabine Sun, Turnbull, petitioner's assistant marine superintendent, arranged by telephone to have respondent send tugs to take her through the waters ... There was no writing or formal contract concerning the service to be rendered. The agreement pieced out from the oral order and acceptance and prior like transactions between the parties included as one of its terms the [pilotage clause].

*Sun Oil, supra,* at 292, 53 S.Ct. at 135. One of the captains whose tug was sent to assist boarded the tanker to act as pilot. The vessel continued on its way, under its own power, assisted by the tugs. While rounding a point of land, it went outside the channel and sustained damages when it hit an obstruction. The particular information before the court led it to assume that

the accident was not due to any fault of the assisting tugs. The court held, based on the borrowed servant doctrine,[3] that the towage company could validly stipulate in a contract to furnish tugs assistance to vessels under their own power, that the owners of the tugs would not be liable for damages resulting from the tug captains' orders while they were on board vessels.

■ Texaco asks that we set aside this exemption from liability which today appears to be generally accepted throughout the country in pilotage relationships. We do not find that the facts of the case at bar warrant such an action, even assuming we were inclined to overrule a higher court. While the record shows conflicting testimony as to whether Captain Barchi signed the approval slip containing the pilotage clause before or after the collision, the record is clear that Texaco had a 15 year history of approving agreements containing the clause, and as it had always done before, requested the service by telephone, specifying the particulars. Texaco's argument that Boston Tow enjoyed a monopoly and, therefore, had a superior bargaining position is without merit. The evidence reveals three additional tow companies operated in Boston Harbor with personnel holding the appropriate coast guard licenses to provide docking master services. Additionally, Texaco had employees of its own who held the requisite licenses. What Texaco's argument does show, rather than a de facto monopoly, is their evaluation that Boston Tow's pilots were the most experienced and

2. The pilotage clause reads in its entirety:
 PILOTAGE–When the captain or other officer of any tug provided for, or engaged in, the service of furnishing tug power for, or assistance to, a vessel which makes use of or has available her own propelling power goes on board the said vessel or any other licensed pilot goes aboard said vessel, it is understood and agreed that said tugboat captain or other officer or licensed pilot becomes the servant of the owners of said vessel in respect to the giving of orders to any of the tugs provided for, or engaged in, said service and in respect to the handling of such vessel, and neither those providing the tug or tugs, nor the tug or tugs, their owners, agents, or charterers shall

be under any liability for damages resulting therefrom, and, further, that said tug or tugs and/or their owners, agents and/or charterers shall be under no liability for executing the orders of said tug captain or other officer or licensed pilot.

3. Under the criteria of *Restatement (Second) of Agency*, § 220(2) (1957), the more proper characterization of the docking master might be an independent contractor rather than a borrowed servant. *See generally* Note, *The Pilotage Clause: Albatross of Admiralty Law*, 64 Boston L.Rev. 823, 835–47 (1984). Such a status could lend even greater support to the rationale of relief from liability of the towage company.

competent ones available, and it was for this reason that they were hired.[4]

Texaco cites *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), as evidence of a significant change of public policy that requires reexamination of the *Sun Oil* holding. The question presented in *Bisso*, however, was whether a tug towing a barge that had no propulsion, steering apparatus, officers or crew, could validly contract against all liability for its own negligent towage. As Texaco itself points out, *Bisso* did not overrule *Sun Oil;* it carefully distinguished the position and responsibility of pilots, from towage employees in general:

> A pilotage clause exempts for the negligence of pilots only; a towage clause exempts for all negligence of all towage employees. Pilots hold a unique position in the maritime world and have been extensively regulated both by the States and Federal Government ... Under law and custom they have an independence wholly incompatible with the general obligation of obedience normally owed by an employee to his employer ... As a rule no employer, no person can tell them how to perform their pilotage duties. When the law does not prescribe their duties, pilots are usually free to act on their own best judgment while engaged in piloting a vessel.

*Bisso, supra,* at 93–94, 75 S.Ct. at 633–34. The public policy rationale identified in *Bisso*—that wrongdoers should not be immunized from the consequences of their negligence—is not incompatible with the *Sun Oil* rationale. Nowhere does *Sun Oil* relieve the individual pilot from the consequences of his negligence. The stipulation's validity is addressed only to the towing company that is allowing its captains "time off," so to speak, to perform another job.

■ The burden of establishing that a contractual provision is against public policy is on he who makes such an assertion. *National Distillers Products Corporation v. Boston Tow Boat Co.*, 134 F.Supp. 194, 202 (D.Mass.1955). Texaco has not met this burden.[5]

■ Alternatively, Texaco argues that attorneys' fees cannot be indemnified in this situation. In general, it has been held that in admiralty cases, attorneys' fees will not be awarded. *See American Union Transport Co. v. Aguadilla Terminal, Inc.*, 302 F.2d 394, 396 (1st Cir.1963). Where the pilotage clause is held effective, however, the tug company can obtain indemnity from the assisted vessel. *See, e.g.,* A. Parks, *The Law of Tug, Tow, and Pilotage* 1064 (2nd ed. 1982). Even absent specific language providing for the payment of attorneys' fees, an indemnitee is entitled to such fees from his indemnitor. *Cormier v. Rowan Drilling Co.*, 549 F.2d 963, 971 n. 9 (5th Cir.1977). The courts have applied this as an exception to the

---

4. Vessels using the services of Boston Tow boats are not required to use its pilots as docking masters.

5. Additionally and perhaps equally important is the fact that we do not have before us information about the economics and organization of docking pilotage with which we can evaluate the consequences of a change in the established rule. Evidence in the case showed that Perkins received a $90 fee for his service as docking master. If the expense of the added liability is greater than the possible economic benefit to the towing companies, the companies might conceivably refuse to allow their captains to act as docking masters, thus creating a situation whereby those most qualified would be unable to perform this service. Alternatively, as pointed out in Parks, *The Law of Tug, Tow and Pilotage* 1068 (2nd ed. 1982):

> It must be remembered that literally every ship being piloted has already procured P & I insurance insuring the liability of its owner to third parties for negligent acts of its master, crew and pilots. If the "loaned employee" status of the harbor pilot is to be ignored, then the tug company, both with respect to its assisting tugs and its "loaned" harbor pilot, must procure insurance in an amount equal to the full value of the largest vessel handled and her cargo. The cost of such insurance necessarily must be included in the ship assistance rates charged, in which case vessel owners will be paying twice for insurance against the same risks.

(Emphasis in original). *See also, Kane v. Hawaiian Independent Refinery, Inc.*, 690 F.2d 722, 724–25 (9th Cir.1982). The public interest might, therefore, best be served by retaining the pilotage clause.

general admiralty rule. *See Cotten v. Two "R" Drilling Co.,* 508 F.2d 669, 671 (5th Cir.1975); *Moran Towing & T. Co. v. Navigazione Libera Triestina, S.A.,* 92 F.2d 37, 41 (2d Cir.1937). The granting of attorneys' fees against Texaco is thus proper.

*Prejudgment Interest*

 Texaco argues that the award of prejudgment interest from the date of collision is erroneous, because the City did not repair most of the damage,[6] and thereby, suffered no loss of return on expended capital. It is also alleged that the City did not suffer substantial loss of use of the bridge. Citing *Stevens v. F/V Bonnie Doon,* 655 F.2d 206, 209 (1981), Texaco maintains that an award of interest on unspent amounts does more than compensate the City for its losses; it serves to penalize Texaco by making it liable for interest even though the plaintiff had full use of its money. What Texaco ignores is that inflation will make the cost of repair greater today than at the time of the collision. In addition, Texaco, too, has had full use of its capital during the years of negotiation and litigation. To allow Texaco to reap the benefit of its delay in paying for the damage, while requiring the City to bear the expense of inflation, is to reward Texaco for its failure to reach an early settlement. Texaco argues that the general rule in collision cases in admiralty is that the prejudgment interest is to be awarded from the date of the actual casualty or loss, *or* from the date of the payment for repairs. *Moore-McCormack Lines v. Amirault,* 202 F.2d 893, 899 (1st Cir.1953). This would seem a logical way to compensate for both the inflation in costs of repair prior to the work being done, and the loss of interest on capital expended in making the repairs.

While the damages in this case are clearly of a different nature than those in which vessels are totally lost or put out of service, or even when there is no loss of service,[7] they are, nonetheless, compensable. It has been over six years since the TEXAS virtually destroyed the City's fender pier through no fault or contributing negligence of the City. Since that time the City has suffered an increased risk to its citizenry due to the loss of protection provided by the previously sound structure. While it is unclear which estimate of damages, or combination thereof, was used by the court in making its award, we do not find, based upon the evidence presented by the City, that the damages plus interest awarded from the date of collision, has unjustly enriched the City. The City is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk free obligations. *Independent Bulk Transport v. Vessel MORANIA ABACO,* 676 F.2d 23, 27 (2d Cir.1982). The 9% articulated by the trial court is considerably less than the 12% prime rate average that is recognized as reasonable for that period of time. *See, e.g., Marcial Ucin S.A. v. S.S. Galicia,* 558 F.Supp. 299, 303 (D.Mass.), *aff'd,* 723 F.2d 994 (1st Cir.1983); *Independent Bulk Transport v. Vessel MORANIA ABACO, supra; Ameejee Valleejee and Sons v. M/V Victoria U.,* 661 F.2d 310, 313–14 (4th Cir.1981). Likewise, there is substantial evidence in the record to support the district court's assessment at 1979 prices. Therefore, we cannot consider that the court's total assessment for damages and prejudgment interest is clearly erroneous or that adding interest from the date of the collision has penalized Texaco.

The decision of the district court is *affirmed.*

---

**6.** Repairs to the bridge sidewalk costing $4,722 were made in 1979. Services and repairs made after that date totaled $6,395.

**7.** *See, e.g., Stevens v. F/V Bonnie Doon,* 655 F.2d 206, 209 (9th Cir.1981); *Mid-America Transpor-* tation Co. v. Rose Barge Line, Inc., 477 F.2d 914, 916 (8th Cir.1973); and *Utility Service Corp. v. Hillman Transportation Co.,* 244 F.2d 121, 125 (3rd Cir.1957).